# Appendix A - Curated Evidence Index

This section provides a curated index of the evidence contained in this document in the context of each violation.

## I. Deceptive Login Registration Funnel

a. [**Fig 9.10.9**] The choice between "*Sign up*" and "*Log In*" implies the existence of two distinct processes: *registration* and *login*. If the user chooses the "*Log In*" option to determine the existence of an account with their email, they can be deceived into believing that an account had already existed, when in fact they had just been registered.
b. [**Fig 9.10.10**] The "*Welcome back!*" messaging implies this process is for returning users with existing accounts. The "*Don't have an account? Sign Up*" link directs the user to the registration process. This clearly indicates to the user that there are two distinct processes for login and registration, that the user is returning and is "welcome *back*" and therefore is in the login process. An off-ramp to the registration process is offered, which indicates that the current login process the user is in is not for registration. The presence of the registration off-ramp contributes to the deception of the login registration funnel.
c. [**Fig 9.10.4**] The message "*Log in with this 6-digit code to continue*" implies that the user is in the login process. The email contains no indication of a new account being created or registered, and the user has no reason not to believe that they did not already have a valid, existing account at this point in the process. This email contributes to the deception by providing a registration experience that appears to be a login experience.
d. [**Fig 9.10.13**] The "*We need a few details to complete your account*" messaging implies (to some) that the account existed prior to the initiation of the process, and needs a few details to become complete. If the user believes that they are in a login process, then they will reasonably interpret "completing" to mean "updating", not "creating". This contributes to the deception by collecting information for registration in a way that can be interpreted as an update operation on a pre-existing account, as part of a login process.
e. [**Fig 9.10.14**] "*Welcome back*" is displayed prominently on the user's first visit to the site, solidifying the user's belief that they had just completed a login process and had verified that an account had already existed. This messaging solidifies the deception by confirming the deceived user's false belief of having a pre-existing account, when in fact they had never logged in to the site before.
f. [SCREEN RECORDING A] (silent), [SCREEN RECORDING N] (narrated) Video demonstrations of the full deceptive registration funnel at homeadvisor.com.
g. (**11/4 2:45pm**)[**Fig 11.4.3**] In Angi's response to a request for comments that included a question about the function and purpose of the deceptive login registration funnel, they asserted:

      i.    "*Angi's registration process is compliant with state and federal laws."* This assertion is part of what is being tested by the evidence presented herein.

      ii.   *"Further, please note Angi does not report consumer user acquisition metrics*." This assertion is part of what will be tested by a deeper inspection or discovery of facts.

h. **(11/5)**[**Fig 11.5.1**][**SCREEN RECORDING W**] In the Nov 5 earnings call, CEO Jeffery W Kip said "*we will progressively be delivering ... platform pieces which both have the chance to improve conversion and the customer experience*". The deceptive login registration funnel has the potential to fit both of these characteristics, with the additional characteristic of being deceptive.

Angi's deceptive login registration funnel uses a design that obstructs cancellation and carries the potential to inflate certain user acquisition metrics, if they were to be reported. This mechanism is part of a larger pattern of systemic deception.

## II. Obstructive Cancellation Methods: Roach Motel

### a. Website Obstruction

1. [**Fig 9.10.8**] homeadvisor.com did not present phone numbers, email, web chat, or web form contact methods. Cancellation is obstructed while the user searches for a working method to cancel.
2. [**Fig 9.10.8**] The homeadvisor.com social media links directed the user to "Angi" profiles on social media, and the "*About Us*" panel expanded to reveal a "*Contact Us*" link that navigated to an entirely different domain, angi.com. Cancellation is obstructed until the user gains awareness of the relationship between HomeAdvisor and Angi.
3. [**Fig 9.10.5**] The angi.com. "*Contact Us*" page did not provide an email contact, web chat, or web form to reach support. Social media, phone number (888-811-2644), and mailing address contact options were provided. Cancellation is obstructed while the user searches for email or website cancellation methods.
4. [**Fig 9.15.3**] The next steps for cancellation were eventually discovered by expanding the "*About Us*" footer panel, navigating to the "*Contact Us*" page, navigating to "*View FAQ*", and expanding the panel titled "*How do I cancel my Angi Key Membership?*". The panel presented a link to a membership page at angi.com, a link to a "*Help Center*" referencing a live chat method, and another, separate phone number: 866-623-6088. Cancellation is obstructed by the placement of cancellation steps behind a maze.
5. [**Fig 9.12.4**] After the membership was successfully cancelled from angi.com, the cancelled status of the Angi Key Membership was not clearly indicated on the homeadvisor.com site, making it unclear if the cancellation was completely successful. A message stated "*Your benefits are still available to you until September 11, 2026*", which does not confirm cancellation.  Confirmation of successful cancellation is obstructed while the user is uncertain of the true status of their membership(s).

6. [**Fig 9.10.9**][SCREEN RECORDING A] An effect of the deceptive login registration funnel at homeadvisor.com is obstruction of cancellation. Users are obstructed from accessing the account they need to manage when they are seeking a method of cancellation or removal of payment information in an account that had just been deceptively registered.

### b. Dysfunctional Phone System (1-888-811-2644)

1. [**Fig 9.10.6**] 5 calls were placed to attempt to cancel membership, each one was automatically disconnected, obstructing cancellation by forcing a restart of the process.
   a. Call 1: no option selected at level 1, disconnected after 0:57 seconds
   b. Call 2: no option selected at level 1, disconnected after 0:57 seconds
   c. Call 3: no option selected at level 1, disconnected after 1:00 minute
   d. Call 4: option 1 selected at level 1, no option selected at level 2, disconnected after 2:39 minutes
   e. Call 5: option 1 selected at level 1, no option selected at level 2, disconnected after 2:42 minutes
2. (**9/10 9:24am**) At the beginning of each call the automated voice stated "*An advisor will be with you shortly*", implying a default option existed where the user would be connected with an advisor for assistance if no choice was made. Cancellation is obstructed while the user waits for the advisor that never arrives.
3. (**9/10 9:33am**) The automated prompts did not contain an option for billing, cancellation, or membership management. Cancellation is obstructed while the user attempts to locate the needed options to cancel, which are not presented. The IVR tree presented the following options:
   a. (1) Homeowner calling to get support
      i. (1) Find a pro for a new home project
      ii. (2) If you have booked a prepriced service through retail partners
      iii. (3) Need help with a project request you've already submitted or have a general question
      iv. (4) Green, Silver or Gold Angie's List member with support question, or to submit or edit a review
   b. (2) Pro calling on behalf of a business
   c. (Spanish)

### c. Unresponsive Social Media Support

1. (**9/10, 9:52am**)[**Fig 9.10.7**] A public request seeking a working cancellation method was submitted to Angi's official public Facebook page which did not receive a timely response from Angi, obstructing cancellation through delays.
2. (**9/12 12:08pm**)[**Fig 9.13.5**] The response from Angi support, over 50 hours later, was posted in the same public thread as the Angi impersonator, "Customer Help Service" (CHS), directing me to another private conversation. I informed Angi of the impersonator's presence in the public thread, but Angi did not respond, instead waiting for me to contact them directly. Cancellation was obstructed while Angi waited for me to

resolve the ambiguous identity of the impersonator and establish private contact instead of providing information or taking action that would have supported me.

3. (**9/19 5:08pm**)[**Fig 9.19.3**][**Fig 9.19.5**] I followed up with a direct message and provided Angi with the information they needed to locate the membership, and clearly requested confirmation of cancellation and removal of my payment info. Angi by this time had silently issued a refund to my card, and my wife had cancelled the membership through a different channel, so what I still needed was confirmation and removal of my payment data from all of Angi's systems. Angi Support never responded to me, obstructing confirmation of cancellation.

### d. Fragmented Domain Architecture

- [**Fig 9.10.1**][**Fig 9.10.2**] The $29.99 debit transaction from Sep 10 contained homeadvisorhandy.com in the Merchant Details, an invalid domain, which obstructed cancellation at first contact by not clearly indicating the source of the charges.
- [**Fig 9.12.1**][**Fig 9.12.2**][**Fig 9.12.3**] My wife, intending to cancel her "Angie's List" membership, navigated to angieslist.com, which redirected her to angi.com, where she cancelled the "Angi Key Membership" associated with my debit card using a simple one-click process. After cancelling the membership at angi.com, my wife received a confirmation of cancellation from book.angi.com, as well as a separate "*cancellation of booking plan*" email. This process did not indicate that a "HomeAdvisor" membership or account had been cancelled, obstructing confirmation of the cancellation of the membership that the $29.99 charge had originated from (HomeAdvisor).
- [**Fig 9.12.4**] My wife navigated to homeadvisor.com to cancel any membership in this system, which displayed the message "*Your benefits are still available to you until September 11, 2026*". The user interface did not provide clear indication that the membership had been cancelled, obstructing confirmation of cancellation of any and all Angi memberships.
- (**11/4 2:45pm**)[**Fig 11.4.3**] In Angi's response to a request for comments that included a question about Angi's cancellation practices, they stated "*Angi's cancellation processes are compliant with state and federal laws.*", which will be tested by a deeper inspection or discovery of facts.
- (**11/5**)[**Fig 11.5.1**][**SCREEN RECORDING W**] In Angi's November 5th, 2025 earnings call, CEO Jeffery W Kip provided some context and background on the company's technical debt, saying "*I think we've been very much held back on our ability to move with speed across the product and the customer experience for multiple years here by the legacy technology and tech debt*". A fragmented domain architecture is technical debt formed by acquisitions and integrations that a company makes an intentional choice to repay, or not. Angi's fragmented domain architecture is a manifestation of their technical debt that served to obstruct cancellation.

In Angi's November 4th response to a question about their cancellation policies, they simply asserted "*Angi's cancellation processes are compliant with state and federal laws.*" This assertion will be tested against the evidence to the contrary cataloged herein, with these

obstructive cancellation mechanisms being representative components of the systemic deception woven into Angi Inc.

## III. Negligence in Social Media Platform Moderation

a. [**Fig 9.10.16**] My public comment on Angi's official Facebook page received a 😢 cry face emoji from "Customer Help Service" (CHS), which then directed me to a private conversation. Angi did not respond to my request for over 2 days, leaving me to determine if this account legitimately represented Angi.
b. [**Fig 9.10.17**] CHS identified itself as "Angi", establishing an ambiguous situation that I needed support to resolve.
c. [**Fig 9.10.19**][**Fig 9.14.1**] CHS solicited my personal information, including a request for my phone number at 3:43am via Facebook Messenger: "*Where is the reachable phone number?*".
d. (**9/13 11:33pm**)[**Fig 9.13.6**] I publicly informed Angi on their public Facebook Page, in response to their public request, that I had been in contact with CHS, which was present in the same thread as Angi's request to me. I prefixed "*Customer Help Service*" with the possessive "*your*" to indicate that this party had identified itself as Angi to me. I advised Angi to "*coordinate your teams*" to indicate that I had now interacted with multiple parties that identified as "*Angi*". I used this phrasing to force a determination as to whether CHS was indeed an illegitimate entity completely unaffiliated with Angi, or whether CHS represented Angi in some capacity, via a vendor or contractor relationship, or perhaps unsanctioned activities of an Angi employee, or some other association, all of which I considered to be possibilities at the time. Angi did not respond in public or take any evident action to remove CHS at this time.
e. (**9/19, 5:25am**)[**Fig 9.19.1**] I directly contacted Angi and again notified them of the presence of CHS and that I had been in contact with it. I informed Angi of the accessibility of CHS from their public Facebook page.
f. (**9/19 10:28am**)[**Fig 9.19.2**] Angi asserted CHS "*is not associated with Angi and does not appear to be a legitimate entity*" and advised me against giving it my personal information. This was the only private Facebook message I received from Angi Support.
g. (**9/19 4:33pm**)[**Fig 9.19.3**] I reasserted again that CHS remained accessible from Angi's public Facebook page. I also made good faith efforts to clarify Angi's inaccurate technical usage of the term "page" when referring to CHS, as it was an "account" (and even more specifically, a "profile'), to ensure they understood I was accessing it from their page, not from a different page. This was the last message in the conversation.
h. (**9/19 5:08pm**)[**Fig 9.19.4**][**Fig 9.19.5**] I reported CHS to Facebook as "*Fraud or Scam*" after business hours on Friday, once it became clear that any action taken by Angi had not carried the effect of removing CHS from their public Facebook page.
i. (**9/20 3:10pm**)[**SCREEN RECORDING H**] I captured additional screen recordings over the weekend that demonstrated CHS remained accessible from Angi's public Facebook page.

j. (**9/21 7:32am**)[**Fig 9.21.1**] I received a notification from Facebook that CHS had been removed after they confirmed it was indeed illegitimate.
k. (**11/4 2:45pm**)[**Fig 11.4.3**] In Angi's response to a request for comments that included a question about their social media platform moderation policies, they stated "*We regularly monitor our verified social media channels to ensure homeowner complaints are quickly and efficiently addressed. We encourage users to engage only through official, verified Angi channels and report suspicious activity immediately*."
    i. Angi did not respond to my public request seeking a working method to cancel for 2 days, 2 hours, 16 minutes, which is objectively neither quick nor efficient.
    ii. CHS engaged me through the official, verified Angi Facebook page, which is an "*Angi channel*".
    iii. I reported CHS on the day Angi asserted to me that it was illegitimate, which, while not technically *immediate*, was still reasonably quick and efficient, especially considering I had no obligation to do this. It was an act of good faith directed toward Angi's visitors.

Angi was negligent in social media platform moderation, and their denial and deflection demonstrates that their negligence was a deceptive tactic, part of a larger pattern of systemic deception.

## IV. Denial of Data Deletion Rights

a. (**9/12 8:20am**)[**Fig 9.12.2**] Tammy received confirmation of cancellation of the Angi Key Membership associated with my debit card ending in 2667. After this moment, Angi no longer had any legitimate justification for keeping my debit card's payment information in their systems, as we had ended our business relationship.
b. (**9/19 5:25am**)[**Fig 9.19.1**] I contacted Angi directly, seeking written confirmation that my card had been entirely removed from Angi's systems and would not be billed again, clearly expressing my will for my financial data to be removed.
c. (**9/19 4:33pm**)[**Fig 9.19.3**] I supplied Angi with my wife's name, spelled correctly, and her email address. I explained that my name was on the debit card ending in 2667, and that my wife was an authorized user. Angi did not acknowledge or reply to this message.
d. (**10/3 ~5:00pm**)[**Fig 10.3.1**][**SCREEN RECORDING I**] The angi.com payment method section had an "*Update Payment Method*" option that required a new, valid card. I tried entering fake numbers to determine if I could remove the payment method, but the update operation failed, and my 2667 card remained retrievable through the user interface from my wife's account. Angi holds a payment method to retrieve this information from their Data Processor.
e. [**SCREEN RECORDING O**] The account settings user interface at angi.com did not provide a delete option. There was no way for me to remove my own card through the user interface.
f. (**10/16 7:53pm**)[**Fig 10.16.11**] I sent Angi a formal demand to remove my debit card ending 2667 from all systems under Angi's control, setting a deadline of Oct 31, 5:00 PM

Pacific Time, giving Angi 10 full business days to comply. I consistently spelled my wife's last name correctly, L-I-T-C-H-F-I-E-L-D, exactly the same way as my last name.
g. (**10/27 1:11pm**)[**Fig 10.27.5**] With less than 5 days remaining before the 10/31 deadline, I received a reply from Angi's Director/Sr. Corporate Counsel, Jaime Padgett.
   i. The reply stated "*We possess no such information under any account in your name*", which is proveably false, since an account under my name was created on September 10th as part of the deceptive login registration funnel [**Fig 9.10.9**]. Also, my name is on the card, which is part of the payment method information, which Angi "possesses" as the Data Controller.
   ii. The reply requested "*I kindly ask that Tammy Litchenfield [sic] subject a request to PrivacyOfficer@angi.com to exercise any privacy rights on her account*". Tammy's last name was spelled incorrectly, despite it being delivered with consistent accuracy, and despite being told repeatedly that she was my *wife*. A reasonable person would have reverified the spelling of a "*Litchenfield*" married to a "*Litchfield*". This was a bad-faith obstructive tactic, and it would be insulting for Angi to claim this as an unintentional mistake.
h. Tammy and I coordinated a response to neutralize Angi's procedural issue:
   i. (**10/27 5:54pm**)[**Fig 10.27.6**] Tammy formally exercised her right as a Data Subject under her email address to instruct removal of her personal information. She delegated total authority to manage her data to me, and then explicitly instructed Angi to make no further contact with her, instead directing all contact to me.
   ii. (**10/27 7:20pm**)[**Fig 10.27.7**] I accepted Tammy's delegation of data subject authority, corrected Angi's false statements, declared the procedural issue resolved, and reasserted the 10/31 deadline to remove my financial data.
i. Angi responded the next day with conflicting information, asserting my request had been "*completed*", "*denied in part*", and "*resolved*", and claimed that the CCPA authorized denial of some unspecified part of my request.
   i. (**10/28 9:48am**)[**10.28.1**] An email from noreply@angi.com with the subject "*Your request to delete information at Angi has been completed*" asserted "*When we received your request and verified your identity, we promptly processed it accordingly and your request was complied in part and denied in part, as authorized by the CCPA*." The email did not specify what part of the request was complied and which part was denied.
   ii. (**10/28 9:52am**)[**10.28.2**] An email from the Angi Service Desk asserted that my "*Data Request: CCPA Delete Data*" ticket (INC-2549943) had been "*resolved*". Again, there was no mention of what action was performed, other than indicating the ticket was "*resolved*".
j. (**10/28 8:40pm**)[**10.28.3**][**SCREEN RECORDING P**] After receiving Angi's assertion that they had completed and resolved my request, I accessed Tammy's account at angi.com and I was able to retrieve my 2667 debit card payment information, as well as Tammy's phone number and our home address, verifying that Angi had still **not** complied with my request, as our data remained accessible from their system.
k. (**10/28 10:01pm**)[**Fig 10.28.5**] I responded to correct the record and "*confirm that ticket INC-2549943 is not resolved*", and explained how I was still able to access the data

EXHIBIT A - v10.2-civil Forensic Evidence Map - Page 144 of 163

that should have been deleted. I reasserted one more time that the 10/31 deadline stands.

l. (**10/28 11:14pm**)[**Fig 10.28.6**] In defiance of Tammy's explicit instructions to cease contact and to communicate only with me, Angi delivered an email to my wife, instructing her to complete a privacy request form to "*initiate*" a privacy request.

m. (**10/31 6:45pm**)[**Fig 10.31.2**][**SCREEN RECORDING R**] The October 31 5:00 PM deadline passed, and Angi had not deleted my payment method information for my card from their systems, as demonstrated by a screen recording captured at 6:45 PM from Tammy's account. Angi failed to comply with the formal data deletion order after making false assertions of their compliance.

n. (**11/4 2:45pm**)[**Fig 11.4.3**][**SCREEN RECORDING V**] In a response to my request for comments for an article publication, Angi asserted
    i. "*We have **now** completed the deletion on Mrs. Litchfield's accounts.*"
        1. This is an explicit admission that the data was not deleted before November 4th
        2. A captured screen recording demonstrates that Tammy's account now displays the message "*we need a few details to complete your account*", indicating that the account had been deleted.
        3. Angi's assertion of compliance came after the deadline set by the formal data deletion order, and after Angi had falsely asserted completion and resolution of the request.
        4. Therefore, Angi failed to comply with my formal data deletion demand.
    ii. "*Please note Angi does not collect, store, or maintain credit card information. This information is collected, maintained, and stored by an accredited, third-party vendor, Stripe*". This is factually incorrect. The data is collected by Angi through the user interface. As the Data Controller for the data subjects in question, Angi carries the obligation to delete the payment method, not the Data Processor, Stripe.
    iii. "*we do not receive this information itself. Payment information is transmitted directly to our payment card processing vendor*". This is also factually incorrect. Angi *receives* the information through their user interface, and then transmits to Stripe. The request to retrieve card information is made to Stripe from Angi's systems, and requires holding the payment method information in order to retrieve the card for display in the user interface. Angi misrepresented technical facts and California privacy law to attempt to reframe the narrative in their favor.
    iv. As the Data Controller, Angi failed in their obligation to delete the payment method for my card that would have had to have been in their possession in order to successfully retrieve the card details from the Data Processor, Stripe.

o. (**11/4 2:45pm**)[**Fig 11.4.3**] Angi concluded with a categorical denial, an accusation that I had made false or misleading statements, and they issued a legal threat: "*As you are aware these allegations are false and misleading, please note we will not hesitate to take action for any and all defamatory, misleading, or incorrect statements made by you*. I immediately interpreted this as an attempt at intimidation against an SEC Whistleblower. Upon deeper examination, I discovered a fatal, self-defeating paradox in Angi's closing argument. It makes two core claims, both of which cannot be true:

      i. **Claim A**: My allegations are "*false and misleading*" and form the valid basis for a defamation suit.
      ii. **Claim B**: An explicit admission on November 4th that my data was *now* deleted, and therefore not deleted before then, as I verified on October 31 after the deadline, making my allegation of Angi's non-compliance entirely truthful.

Angi demonstrated bad faith and obstructive policies at every layer I encountered, with so many attempts at deceit and obstruction it is impossible to conclude that these patterns form anything other than deliberate, intentional, systematic deception.